# United States District Court
## Northern District of Indiana
### Hammond Division

| | | |
|---|---|---|
| LUIS E. CABAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:09-CV-192  JVB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Luis E. Caban applied for Disability Insurance Benefits and Supplemental

Security Income Benefits under the Social Security Act on March 30, 2006.  Following the

denial of his initial application and subsequent request for reconsideration, Plaintiff now seeks

judicial review of the final decision of Defendant Michael Astrue, Commissioner of Social

Security.

## A. Procedural Background

Plaintiff filed for Disability Insurance Benefits and Supplemental Security Income

Benefits under the Social Security Act on March 30, 2006, alleging disability since October 31,

2005. (R. 21.)  On May 15, 2006, Plaintiff's initial application was denied. (R. 46.) Plaintiff's

subsequent application for reconsideration was also denied on June 28, 2006, (R. 47) prompting

Plaintiff's request for a hearing before an Administrative Law Judge ("ALJ"). (R. 49.) On

November 19, 2008, ALJ Bryan J. Bernstein entered an unfavorable decision, determining that

Plaintiff was not entitled to Disability Insurance Benefits or Social Security Income benefits. (R.

35.) The ALJ found as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since October 31, 2005, the alleged onset date.

3. The claimant has severe impairments.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in CFR Part 404, Subpart P, Appendix 1.

5. The claimant is not fully reliable.

6. After careful consideration of the entire record, it is determined that the claimant retains the capacity to perform a restricted range of work activity [].

7. The claimant is unable to perform any past relevant work.

8.  The claimant was born on May 8, 1961, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

9. The claimant has at least a high school education and is able to communicate in English.

10. The claimant has acquired work skills from past relevant work.

11. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

12. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2005, through the date of this decision.

(R. 24–35.)

Plaintiff challenged the decision on November 20, 2008, filing a Request for Review of

Hearing Decision/Order. (R. 16.) The ALJ's decision became final on May 18, 2009, when the

Appeals Council denied Plaintiff's request for review. (R. 1–3.)

**B. Factual Background**

**(1)** *Preliminary Events*

Plaintiff was born on May 8, 1961, and is a highschool graduate with an associate degree

from Ancilla College. (R. 5, 562.) His past relevant work experience includes employment as a

cook, shipping and receiving clerk, educational aide, and various sales positions. (R. 5, 132.)

Following October 2005, Plaintiff has worked intermittently earning $7,078.51 in 2006. (R. 66.)

During that time his work ranged in exertion levels from light to medium and the requisite skill

level varied from semi-skilled to skilled. (R. 72.)

**(2)** *Medical Evidence*

(a) *Pre-2005*

In March 2001, Plaintiff was diagnosed with hypertension (high blood pressure), morbid

obesity, and sleep apnea. (R. 525.) On April 16, 2001, Plaintiff underwent a bariatric surgery

known as Roux-en-Y gastric bypass surgery with a liver biopsy and gastrostomy tube placement

in order to treat his morbid obesity. (R. 513.) Following the surgery, Plaintiff lost over 150

pounds. (R. 567.)

(b) *2005*

On March 31, 2005, Plaintiff underwent a procedure (left extracorporeal shockwave

lithotripsy) to treat an 11-mm left renal pelvic calculus (kidney stone) discovered during a CT scan. (R. 499.) Plaintiff was also diagnosed with pelvic phleboliths (masses in a vein). (R. 500.) On April 3, 2005, Plaintiff was admitted to the hospital with acute left renal colic, acute multiple left ureteral calculi, and mild hydronephrosis (distention of the kidney). (R. 491.) The following day, under the care of Dr. Thomas Koerner, he was diagnosed with uretral stones, large amounts of bowel gas obscuring his kidneys, and bilateral pelvic calcifications. (R. 484–85.) Later in April, Plaintiff was diagnosed with an 8 x 15 mm stone in his left kidney. (R. 477.)

In September 2005, Plaintiff began to complain about severe intermittent upper quadrant abdominal pain. (R. 458.) Dr. Scott Tarlton examined Plaintiff and, noting that the kidney stones had passed but a gallstone was present, diagnosed him with prostatic hypertrophy (enlarged prostate), possible mild ileus (blockage of the intestines), and hypokalemia (low blood potassium). (R. 471–73.) Plaintiff then underwent a diagnostic gallbladder sonogram which showed large gallstones in his bladder and a thickened gallbladder wall and was diagnosed with chronic calculus cholecystitis (gallbladder inflammation) with acute exacerbation. (R. 458.) On October 21, 2005, following a diagnosis of cholelithiasis, doctors performed a laparoscopic cholecystectomy (gallbladder removal). (R. 458.) Plaintiff then underwent an esophagogastrojejunoscopy following his reports of abdominal pain and blood in his stool on November 9, 2005. (R. 425.) The procedure reportedly went well with no complications. (R. 425.) However, Plaintiff was diagnosed with swirling mesentric vessels in the left mid-abdomen and bilateral renal cysts. (R. 438.) That same day, doctors performed an exploratory laparotomy with repair of mesenteric defect and ventral hernia repair (surgery to repair a hernia) . (R. 426.)

In December 2005, Plaintiff was involved in a motor vehicle accident and, following

complaints of severe neck and back pain, was taken to the emergency room. (R. 415.) Plaintiff was a belted passenger in a parked car that was hit when another car attempted to pull into the adjacent parking spot. (R. 405.) Dr. Giasuddin Ahmed diagnosed Plaintiff with cervical spondylosis (abnormal wear on cartilage and bones of the neck) without acute abnormalities, mild lumbar spondylosis (bony overgrowths on the spine) without fractures, and mild lumbar multilevel degenerative disc disease without fracture or displacement. (R. 417.) The doctor also noted that Plaintiff had a history of degenerative joint disease of the neck and back and had C6-C7 spinal surgery in 1996. (R. 415.)  Plaintiff was prescribed Darvocet-N and sent home. (R. 415–16.)

Following Dr. Ahmed's instructions to see his primary care giver, Plaintiff saw Dr. Teresa Smith the following week. (R. 405.)  Plaintiff requested more Darvocet stating that it helped him sleep. (R. 405.)  He reported no back pain, or numbness, tingling, or weakness in his lower extremities. (R. 405.)  Dr. Smith noted that his gait and station were without abnormalities, and his muscle tone, reflexes, and muscle strength were normal. (R. 405.) Plaintiff was diagnosed with thoracic (back) pain and glycosuria (glucose in the urine) and given a prescription for Skelaxin and Darvocet. (R. 405.)  Dr. Smith also noted that Plaintiff has a history of situational depression and mild asthma. (R. 401.)   On December 22, 2005, Plaintiff underwent an echocardiogram and stress test while under the care of Dr. Naveen Lal. (R. 393.) The results showed a left ventrical ejection fraction (fraction of blood pumped out of the left ventricle with each heart beat) of 60% and trivial tricuspid regurgitation (blood flow from the right ventricle to the right atrium during systole, a phase of the cardiac cycle, due to insufficiencies of the tricuspid valve), but an overall good exercise capacity. (R. 393.)

(c) *2006*

On January 4, 2006, following a referral from his primary care physician, Plaintiff met with Dr. Alan McGee, an orthopaedic surgeon. (R. 358.) Plaintiff complained of severe neck and back pain and stated that he had been relatively nonfunctional since the December car accident, so Dr. McGee took x-rays of Plaintiff's cervical and lumbar spine which were unremarkable except for evidence of degeneration. (R. 358.) Dr. McGee determined that while Plaintiff's neurological examination was normal from a motor, sensory, and reflex standpoint, he also observed that Plaintiff had limited motion in his cervical and lumbar spines. (R. 358.) Plaintiff said that the Darvocet and Skelaxin were of little help, so Dr. McGee referred him to a physical therapist and physiatrist and prescribed him Flexeril, an anti-inflammatory, and Ultracet, a painkiller. (R. 358–59, 364–65.)

The following day, Plaintiff met with Dr. Roger Thomas who noted that Plaintiff suffered from bilateral thoracic paravertebral pain and radiating pain into the upper thoracic and lower cervical areas. (R. 356.) He noted Plaintiff had anterior pain and numbness and tingling of the anterior thighs. (R. 356.) He also stated that Plaintiff's worst discomfort, in his mid to lower thoracic region, precluded him from doing any type of activity. (R. 356.) Dr. Thomas reported that when Plaintiff lifted his arm he experienced discomfort and that there was a radiating pain pattern down the extensor aspect of his right arm. (R. 356.) A standard MR sequence of the thoracic spine came back normal and the cervical fusion between the C6-7 appeared well healed and well-aligned. (R. 284.)

Plaintiff participated in physical therapy from January 5, 2006, to February 10, 2006. (R.384–87.) Physical therapist David Anzelmo reported that, while during therapy Plaintiff was

able to decrease his pain, at one point bringing it down to 5/10, the level of pain did fluctuate and one day was so great that a trip to the emergency room was nearly necessitated. (R. 387–88.) On January 19, 2006, Dr. McGee reported that while the Ultracet and Flexeril where taking the edge off the pain, Plaintiff was still in the same discomfort despite the physical therapy. (R. 349.) Although the thoracic magnetic resonance imaging was normal and the C6-7 fusion was still in good alignment, Dr. McGee diagnozed Plaintiff with right thoracic paravertebral myofascial syndrome (chronic muscle pain on either side of the thoracic region of the spine) and instructed him not to work for the next three weeks. (R. 349.) By the end of the physical therapy, Plaintiff's pain was down to 7/10, he had an increased range of motion, and his symptoms were reduced in intensity. (R. 384.)

On February 17, 2006, Dr. Thomas referred Plaintiff to Dr. Shantanu Kulkarni for a cervical epidural injection. (R. 341.) At that time, Plaintiff complained of moderate pain, tenderness in the right facet area, some chest discomfort, shortness of breath, nausea, abdominal discomfort, joint pain, weakness, increased thirst, depression, and decreased movement. (R. 341.) Dr. Kulkarni found degenerative changes in the cervical spine, moderate narrowing of the foramen at C3-4, and left-sided foraminal narrowing at C5-6, as well as mild narrowing on the right. (R. 341.) Dr. Kulkarni also noted that Plaintiff's range of motion in his upper extremities was good and his muscle strength was normal. (R. 342.) Plaintiff was diagnosed with cervical radiculitis (pinched nerve in the neck), cervical degenerative disc disease, and cervical spine pain. (R. 342.) Upon Dr. Kularni's recommendation, Plaintiff received an epidural steroid injections on February 23, 2006, and March 9, 2006. (R. 330–31, 337–38, 342.)

In March, Plaintiff complained of neck pain and stiffness, bilateral shoulder pain, right-

sided numbness, and tingling into his fingers and told his doctors that the injections had not relieved his pain. (R. 319.) Dr. Gregory Hoffman, his attending physician, noted that Plaintiff had a very limited range of motion of his cervical spine and that the Spurling's maneuver caused him pain in his neck. (R. 319.) Dr. Hoffman also noted that Plaintiff's pain did not radiate into his arms and that he had normal strength, normal sensation, and full range of motion in his upper extremities. (R. 319–20.) Plaintiff was then scheduled for a discogram and was kept on his regimen of Flexeril and Ultracet. (R. 320.) In late March, Plaintiff reported to Dr. Hoffman continued discomfort in his neck, and an inability to bend, lift, or twist. (R. 316.)

In April, the results of Plaintiff's discogram showed extensive degenerative disease in his lower back and degenerative changes from his L2 to L5 with some mild stenosis. (R. 306, 308.) The cervical discogram was positive at the C3-4 level, unclear at C4-5 level due to narrow space, and positive at C5-6 level. (R. 308.) Plaintiff stated that the pain was so great he could not work nor participate in his normal activities primarily because of his neck pain. (R. 308.) Dr. Hoffman referred Plaintiff to Dr. McGee who then scheduled surgery.

On May 23, 2006, Plaintiff underwent anterior cervical discectomy with fusion at C3-C4, C4-C5, and C5-C6 utilizing machined allograft and a hallmark plate following his diagnosis of cervical spondylosis with stenosis and radiculopathy. (R. 366.) During a follow up with Dr. McGee, Plaintiff reported decreased pain in his arms, some numbness in his fingers, and tolerable pain in his neck with the aid of Flexeril, Ultracet, and Relafen. (R. 304.)

Plaintiff underwent a Physical Residual Functional Capacity Assessment in May 2006. Dr. Bruce Whitley, the state agency reviewing physician, determined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten or less pounds, and had

otherwise unlimited ability to push or pull. (R. 376.) He found that Plaintiff could sit or stand, with normal breaks, for a total of six hours in an eight-hour work day. (R. 376.) Dr. Whitley found that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and occasionally climb ladders, ropes, and scaffolds. (R. 377.) He noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (R. 378–79.) Dr. Whitley concluded that while Plaintiff's allegations regarding the nature of his symptoms were credible, the contentions regarding the severity and related functional restrictions were not supported by the evidence. (R. 380.)

On July 10, 2006, Plaintiff complained of pain in his right knee so Dr. Roger Thomas had an MRI taken. (R. 278.) The results returned normal. (R. 278.)

On August 18, 2006, Plaintiff underwent a stroboscopy. (R. 215.) Plaintiff was diagnosed with a left vocal fold paralysis with persistent glottic gap (persistent gap between vocal chords) and moderate muscle tension dysphonia (abnormal patterns of muscle activation) by Dr. Thomas Dumas who recommended a temporizing procedure due to Plaintiff's heavy breathing voice and potential for aspiration. (R. 218.) Within two weeks, Plaintiff underwent a microsuspension laryngoscopy with a fat injection into the left vocal fold. (R. 213.) In November 2006, Plaintiff was examined and diagnosed with severe muscle tension dysphagia (trouble swallowing). (R. 210.)

In October 2006, Plaintiff saw Dr. Robert Shugart, an orthopedist, to address his continued back and leg pain. (R. 207.) Dr. Shugart had an MRI taken and noted that Plaintiff's lower back showed mild to moderate stenosis and four-level degenerative disc disease. (R. 208.) Dr. Shugart told Plaintiff that he was a poor candidate for fusion surgery and recommended that

he pursue conservative treatment (R. 208.) To address the pain, Dr. Shugart referred Plaintiff to Dr. Thomas Lazoff.

On November 2, 2006, following complaints of aching and stabbing pains, newer pains and burning sensations in his lower back, and numbness and tickling in his right hand, Plaintiff met with Dr. Lazoff. (R. 203.) Plaintiff was diagnosed with lumbar facet syndrome (back pain in the lower facet joints), lumbar stenosis (spinal narrowing), discogenic low back pain, degenerative disc disease, disc protrusion, and facet arthropathy and was placed on Neurotin. (R. 204–06.) Dr. Lazoff noted that Plaintiff's cervical range of motion was reduced by 50% in all planes and sensation was impaired along the anterolateral left thigh, but that Plaintiff had a negative straight leg raising test and normal strength in his extremities. (R. 204.)  Plaintiff subsequently asked Dr. Lazoff to complete disability paperwork; Dr. Lazoff recommended that Plaintiff first undergo a Functional Capacity Evaluation. (R. 202.)

Ms. Gina Smith, a registered occupational therapist, administered the evaluation and determined that Plaintiff was able to work at the light physical demand level for an eight-hour day according to the Dictionary of Occupational Titles. (R. 221.) Ms. Smith found that Plaintiff exhibited minimal symptom/disability exaggeration behavior and displayed three out of five Waddell's signs (the minimum number required to indicate that a patient's pain may be psychogenic not physiological) and three out of twenty-one by Korbon's protocols indicating that a few non-organic, or non-physiological, signs were present. (R. 221.) Plaintiff passed twenty-one out of thirty-seven Blankenship validity criteria (measuring if maximum effort without any pain increase has been achieved) during the evaluation, suggesting fair effort and valid results. (R. 221.)

During the evaluation, Plaintiff rated his present pain at 7/10, his best days at 5/10, and his worst days at 9-10/10. (R. 262.) He reported stabbing pain, burning sensation, pins and needles, and numbness in his shoulders, neck, lower back, hands, and thighs. (R. 263.) Plaintiff self-reports that he is able to lie down from twelve to sixteen hours per day, stand or walk for one to two hours per day, and sit for two to six hours per day. (R. 272.) He further stated that during the past week he experienced a great deal of dizziness, blurred vision, stomach churning, muscle aching in the neck, weakness in the legs, and muscle twitching and jumping. (R. 265.) He reported slight feelings of faintness, nausea, pain in the stomach, dryness of mouth, tension across the forehead, and feeling hot all over. (R. 265.) Plaintiff asserts that he experiences pain in his tailbone and his entire leg, numbness in his leg, and that he has never had a spell in the last year during which time he has felt very little pain. (R. 266.) Furthermore, Plaintiff reports that he relies on medication 90% of the time to deal with his pain, that the pain interferes with 80% of his personal care, that it limits his ability to lift 95% of the time, and that he is greatly limited in his ability to walk, sit, and stand 80% to 85% of the time due to his pain. (R. 267–68.) He reports that his pain interferes with his social activities 90% of the time, his sleep 75% of the time, his ability to ride in a car 80% of the time, his mood 50% of the time, and has made him unable to work 95% of the time. (R. 268.)

On December 4, 2006, Plaintiff was examined by Dr. David Powell following complaints of difficulty swallowing. (R. 184.) An esophagram showed Plaintiff has a limited laryngeal phase of swallowing, with limited laryngeal elevation. (R. 184.) The records show that the epiglottis does not appear to "flip" completely, but that there was no evidence of frank aspiration or penetration of the airway. (R. 184.)

(d) *2007*

In late February, Plaintiff returned to Dr. Lazoff's office for a followup. (R. 194.)   He reported his pain at 8/10 in his lower back, neck, and shoulders. (R. 194.) He asserted that pain increased with prolonged sitting and reported having headaches for the last two months. (R. 194.) Diagnosed with low back pain with facet syndrome, spinal stenosis, and degenerative low back and cervical pain, Plaintiff was prescribed Elavil to help with the pain that prevented him from sleeping. (R. 194.)

In February 2007, Dr. Lazoff filled out paperwork for Aetna Insurance regarding Plaintiffs condition. (R. 191.)  On the Aetna capabilities sheet, Dr. Lazoff found that Plaintiff could only occasionally (1-33%, .5-2.5 hours per day) climb, lift, reach forward, or carry. (R. 191.) He furthermore found that Plaintiff could never crawl, kneel, pull, push, reach above his shoulder, bend, or twist. (R. 191.) Dr. Lazoff found that Plaintiff could only work for six hours per day and that his restrictions were permanent. (R. 191.) Dr. Lazoff checked the box indicating that Plaintiff was capable of performing light work activity, but restricted it by the notes he put on the Aetna capabilities sheet. (R. 191.)

On March 11, 2007, Plaintiff was admitted to the hospital and was diagnosed with an altered mental status with hallucinations and acute psychotic episode following the death of his mother. (R. 186.) A CT scan came back normal. (R. 188.) Plaintiff was later discharged home with a diagnosis of psychosis NOS (not otherwise specified). (R. 168.) Plaintiff sought treatment and medication for his hallucinations, depression, and bereavement. (R. 156–62.)

In May 2007, Dr. Lazoff completed a Cervical Spine Residual Functional Capacity

Questionaire. Dr. Lazoff noted that Plaintiff has chronic pain in his neck and right hand. (R. 287.) He further noted that Plaintiff has significant limitation of motion and that his impairments are likely to last longer than a year. (R. 287–88.) Dr. Lazoff stated that depression and anxiety add to Plaintiff's symptoms and limitations and that the pain Plaintiff experiences will frequently interfere with his ability to concentrate on even simple tasks. (R. 289.) He also stated that Plaintiff was capable of low stress jobs. (R. 289.) Dr. Lazoff noted that Plaintiff could stand for one hour and sit for two hours at a time and would need to walk for five minutes every ninety minutes. (R. 289–90.) He stated that Plaintiff would need to be able to shift positions at will and would need unscheduled breaks during an eight-hour work day. (R. 290.) He also noted that Plaintiff would need an assistive device while standing or walking. (R. 290.) He found Plaintiff could stand and/or walk for about four hours in an eight-hour workday and sit for about four hours in an eight-hour workday. (R. 290.) Dr. Lazoff determined that Plaintiff could frequently lift and carry ten pounds or less, could occasionally lift and carry twenty pounds, but could never lift or carry fifty pounds. (R. 290.) He stated that Plaintiff could occasionally turn his head right or left, look up, and hold his head in a static position, but could rarely look down. (R. 291.) He also noted that Plaintiff could never twist, stoop, crouch, squat, or climb ladders but could occasionally climb stairs. (R. 291.) He determined that Plaintiff could only reach with him arms for 33% of an eight-hour work day. Dr. Lazoff concluded that Plaintiff would have "good days" and "bad days" that would cause him to be absent from work more than four days per month. (R. 291.)

On June 11, 2007, Plaintiff called Dr. Lazoff's office to express his disappointment concerning Dr. Lazoff's opinions regarding his functional capacity. (R. 196.) Plaintiff informed

Dr. Lazoff's office that he had found another physician to take over his care. (R. 196.)

On October 25, 2007, Plaintiff established care with Dr. Dana Forrest, a family practice physician. (R. 151–52.) Plaintiff had multiple nonspecific complaints primarily involving pain in his neck, lower back, and chest. (R. 151.) He also complained of headaches, difficulty moving his neck, radiating pain in his arms and legs, shortness of breath, and difficulty urinating. (R. 151.) Dr. Forrest prescribed Tramadol, Flexeril, and Mobic to treat Plaintiff's pain symptoms. (R. 152.) Plaintiff requested that Dr. Forrest complete disability forms in support of his Disability Insurance Benefits and Social Security Income applications, although there is no record that Dr. Forrest complied with this request. (R. 152.) At a checkup in November, Plaintiff stated that he was doing well on his new pain medication. (R. 153.)

(e) *2008*

In January 2008, Plaintiff again reported that he had been doing better with his new pain medication regimen. (R. 154.) He stated that most of his neck pain was controlled with the medication but that he still had occasional pain in his lower back that radiates down his left leg into his left knee. (R. 154.) Plaintiff has daily knee pain, takes Tramadol and Mobic daily, and notices increased muscle spasms when he does not take his Flexeril. (R. 154.) Dr. Forrest recommended that he continue taking his current medications daily. (R. 154.)

**(3) *Plaintiff's Testimony Before the ALJ***

Plaintiff testified that he has been unable to work since about October 2005, following his gallbladder surgery. (R. 564.) He also stated that he had a hard time healing from his hernia

surgery in November 2005, which required re-opening the three to four inch incision spot used during his bariatric surgery in 2001. (R.565–66.) Plaintiff testified that while he was able to lose almost 200 pounds following the bariatric surgery, he regained weight after getting hurt. (R.567.) He asserts that his problems came not only from the hernia surgery and gallbladder removal, but also from a car accident. (R. 568.)  This car accident, he stated, caused problems with his neck and back, kept him from work, and prevented him from exercising. (R. 568.)

He reported that he now takes Mobic, Tramadol, Flexural, Ibuprofen, and Lisipinopril to treat his pain and conditions. (R. 569.) Plaintiff testified that he cannot push a vacuum and can only occasionally go to the grocery store or cook. (R. 571.) He stated that his pain level is, and has been since the car accident, between eight and nine out of ten each day and decreases to six or seven out of ten when on pain medication. (R.572, 577.) Plaintiff testified that his knees, especially his left knee, have also caused him pain since around the time of the accident, which he attributed to arthritis. (R. 577.) He said he also experiences pain in his neck and numbness in his fingers. (R. 582.) He further stated that he takes a nap about every six hours because the medications makes him sleepy, and that he has suffered from diarrhea since his bariatric surgery. (R. 573.) Plaintiff testified that to be comfortable, he spends most of his time at home in a recliner with his legs lifted up and neck supported by a pillow. (R. 574.) Plaintiff asserted that he still loses his voice and has problems swallowing. (R. 575.) He also stated that out of every month, he will have between sixteen and eighteen "bad days." (R. 575.)

When asked about his ability to stand, Plaintiff responded that within five to six minutes of standing, he experiences pain in his knees and back, preventing him from walking even two blocks at a time. (R. 578.) Plaintiff also testified that he previously had treatment for mental

health problems but that the treatment ceased because he did not have medical insurance. (R. 579.) Plaintiff insisted that he wants to work and would be working if he could. (R. 584.)

**(4)** *Vocational Testimony*

Dr. Roberts Bakers, a vocational expert**,** testified that Plaintiff's prior work experience provided him with skills that qualified him, despite his physical limitations, for certain jobs that are available in the area. (R.588.) Specifically, Dr. Baker testified that Plaintiff is capable of performing the following available jobs: 200 jobs as a telephone sales person**,** 300 jobs as an information clerk, 300 jobs as a service clerk, 500 jobs as a cashier, 500 jobs as an assembler of small products and 200 jobs as a laundry folder. (R. 588–89.)  Dr. Baker also testified that to maintain a full-time job, an employee could miss no more than two to three days of work each month, and would be allowed two fifteen minute breaks with an hour or half-hour for lunch each day. (R. 590–91.)

## C. Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon judicial review, the court will only consider whether the ALJ's findings are supported by substantial evidence and made under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  In issuing an opinion, the ALJ must, at minimum, state an analysis of the evidence so a reviewing court can make an accurate decision.

*Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). In determining whether the ALJ has satisfied this burden, the court will not re-weigh evidence or make decisions of credibility. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

**D. Disability Standard**

To qualify for Disability Insurance Benefits the claimant must establish that he or she suffers from a disability under the terms of the Social Security Act. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski,*

245 F.3d at 886. A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## E. Parties' Contentions

### (1) *Plaintiff's Contentions*

Plaintiff first contends that the ALJ erred in failing to give controlling weight to the treating specialist's opinion concerning work absences. Plaintiff asserts that since Dr. Lazoff said Plaintiff would miss more than four days per month, and the vocational expert said competitive employment would tolerate only two to three absences per month, a finding of disability should be entered. Furthermore, Plaintiff states that the ALJ's failure to address this issue is grounds for a remand and new hearing.

Second, the Plaintiff contends that the ALJ erred in failing to specify which of Plaintiff's impairments or combination of impairments are severe. Without specifying what impairments are at issue in step two, Plaintiff contends that the ALJ cannot find the "residual functional capacity" contained in step four of the analysis. Plaintiff also raises issue with the same lack of specifics in step three.

Plaintiff then contends that the ALJ failed to construct a sufficient foundation before asking the vocational expert if Plaintiff's past relevant work would accommodate Plaintiff's limitation. Plaintiff asserts that, since the ALJ did not define what he meant by "past relevant

work," the Appellate Court must speculate what set of jobs were being considered and the characteristics of those jobs.

Finally, Plaintiff argues that the ALJ erred in failing to find that the Plaintiff had a medically determinable gastrointestinal impairment, since such a finding was supported by substantial evidence. Specifically, Plaintiff believes that the impairments resulting from his gastrointestinal condition should be looked at in combination rather than as separate impairments.

**(2) Defendant's Contentions**

Defendant asserts that the ALJ did not err in denying controlling weight to Dr. Lazoff's opinion that Plaintiff would miss four or more days of work per month. The ALJ gave great weight to Dr. Lazoff's opinion, to the extent that it was consistent with the extensive functional capacity evaluation. Defendant asserts that the ALJ need only adopt Dr. Lazoff's opinion to the extent that it is supported by substantial evidence of record.

Defendant contends that the ALJ did not err by not specifically identifying the impairments that he determined to be severe at step two and step three of the sequential evaluation process. Defendant alleges that step two is only a threshold question, used as an early screening, making the identification of specific impairments legally irrelevant. In regards to step three, Defendant contends that a commonsense reading of the decision, to which it is entitled, shows that the ALJ considered degenerative disc disease, depression, and anxiety.

As for Plaintiff's complaint about step four, Defendant contends that Plaintiff failed to identify any harm since the ALJ found that the claimant was unable to perform any of his past

relevant work. Additonally, the record reflects that the vocational expert completed and submitted a Past Relevant Work Summary form into the record. The ALJ relied upon this form and the vocational expert's testimony in determining step four.

Finally, Defendant contends that Plaintiff has failed to show that his history of bariatric surgery rendered him disabled. It is the burden of the Plaintiff to supply adequate evidence, and Defendant contends Plaintiff wholly failed to meet that burden.

## F. Discussion

### (1) *Failure to Give Controlling Weight to Work Absences*

Plaintiff argues that the ALJ erred by failing to discuss Dr. Lazoff's finding that Plaintiff physical ailments would cause him to miss more than four days of work per month. Plaintiff contends that this statement, combined with the vocational experts assertion that an employee could only miss two or three days a month and maintain full-time employment, should have been afforded controlling weight. ALJs must give controlling weight to a physician's opinion if: (1) it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) it is "not inconsistent with other evidence in [the] case record." 20 C.F.R. § 404.1527; *see Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). "If the opinion is unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason." *Schaaf*, 602 F.3d at 875. The court will remand an ALJ's determination that lacks adequate discussion of the issues. *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009).

Regarding Dr. Lazoff's opinion, the ALJ noted in his findings that "great weight has been accorded to the physical capacity demonstrated at the functional capacity evaluation and to Dr. Lazoff's opinions to the extent that they adopt these findings." (R. 31.) Furthermore, the ALJ indicated that Dr. Lazoff's opinion was largely consistent with the findings of the functional capacity evaluation and, therefore, given full credit in those regards. (R. 30.) The ALJ also addressed and discounted aspects of Dr. Lazoff's report that were inconsistent with the functional capacity evaluation. The ALJ specifically discussed the dismissal of Dr. Lazoff's February 23, 2007, report indicating that Plaintiff was limited to six hours of work per day, by citing the results of the functional capacity evaluation and Dr. Lazoff's May 31, 2007, report indicating that Plaintiff could work eight hours. (R. 30.) Despite the ALJ's detailed discussion of much of the record, the ALJ's findings contain no consideration of Dr. Lazoff's conclusion that Plaintiff would miss more days each month than the vocational expert determined was allowable in order to maintain full-time employment. An ALJ must consider all relevant evidence, and cannot limit his consideration to "mere portions of a doctors report." *Myles*, 582 F.3d at 678. Therefore, the Court will remand this case on this issue, to provide the ALJ an opportunity to discuss the issue of work absences and build a logical bridge between the evidence not considered and his conclusion.

**(2) Failure to Make Specific Findings Regarding Impairments**

Plaintiff alleges next that the ALJ erred in his analysis by failing to make specific identifications of impairments in step two and step three of his inquiry. However, the second step, which considers whether or not a claimant's impairment is severe, is merely an initial

screening device used to limit the number of cases that require full consideration. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984). Since the ALJ determined that Plaintiff is severely impaired, it is irrelevant whether the ALJ makes a specific finding under step two. *Bradley v. Barnhart*, 175 Fed. Appx. 87, 90 (7th Cir. 2006).

Likewise, the ALJ's specification that he consulted Listing 1.04 (Disorders of the spine) and mental impairments under section 12.00 (Mental Disorders) is sufficient to satisfy step three of the inquiry. A commonsense reading of the ALJ's opinion establishes that he was considering Plaintiff's degenerative disc disease, depression, and anxiety.


**(3) Failure to Define Hypothetical Question Given to Vocational Expert**

Plaintiff argues that the ALJ's hypothetical question posed to the vocational expert was defective because the ALJ failed to specify what positions he was considering. The ALJ found that "claimant is unable to perform any past relevant work." (R. 33.) Whether or not the question was insufficiently specific, and the Court is inclined to find that the Past Relevant Work Summary form filled out by the vocational expert impliedly provided the necessary context, Plaintiff was not harmed because the ALJ found most favorably for the Plaintiff.


**(4) Failure to Consider Plaintiff's Medical Condition in Totality**

Plaintiff asserts that the ALJ minimized the extent of Plaintiff's impairments by considering them individually rather than looking at them collectively. The ALJ's opinion, however, shows a thorough consideration of each impairment, and a strong reliance on the

opinions of medical professionals. The ALJ determined how much weight to give to each

ailment, and it is not the role of this Court to re-weigh that determination.

**G. Conclusion**

The Court REMANDS the case to the ALJ for further consideration on the issue of work

absences as stated in this Opinion and Order.

SO ORDERED on July 29, 2010.

   s/ Joseph S. Van Bokkelen      
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE
HAMMOND DIVISION
